UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

GEORGE, TAMMY                                    JURY TRIAL DEMANDED
    Plaintiff

v.

UNIVERSITY OF NEW HAVEN
    Defendant

**COMPLAINT**

## I.    **INTRODUCTION**

1.    This is an action for employment discrimination brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.; the Connecticut Fair Employment Practices Act, and the Americans With Disabilities Act.

## II.    **JURISDICTION AND VENUE**

2.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), as this action arises under the laws of the United States. Supplemental jurisdiction over any state law claims exists under 28 U.S.C. § 1367.

3.    Venue is proper in the District of Connecticut pursuant to 28 U.S.C. § 1391(b) because Defendant resides in this District, all of the events giving rise to the claims occurred in New Haven, Connecticut, and Defendant's principal place of business is located in New Haven, Connecticut.

### III.    PARTIES

4.    Plaintiff Tammy George is a natural person residing in West Haven Connecticut 06516. She is African American, female.

5.    Defendant University of New Haven. (hereafter referred to as "UNH" or "Defendant") is a Connecticut private co-educational institution offering graduate and undergraduate degrees in a wide variety of academic pursuits.

6.    At all relevant times, University of New Haven was an "employer" within the meaning of Title VII, the Connecticut Fair Employment Practices Act, and the Americans with Disabilities Act.

7.    On or about September 3, 2024 Plaintiff filed a complaint of discrimination with the Commission on Human Rights & Opportunities.  On  February 5, 2026 Plaintiff was issued a Release of Jurisdiction from the in  CHRO Case 2530156; Case 253057; and Case 2530310.   On March 5, 2026 Plaintiff received a right to sue letter from the U.S.Department of Justice with respect to her Title VII and ADA claims in EEOC Case 16A-2025-00392; 16A-2025-00468; 16A-2025-00021.  Plaintiff has exhausted all required administrative remedies prior to brining this federal action.

### IV.    FACTUAL ALLEGATIONS

8.    Plaintiff became employed by UNH in 1999 as a part-time administrative clerk II. Plaintiff was assigned to work in the Admissions office of Defendant.

9.    In or around 2014 Plaintiff was promoted to the position of data communications specialist.

10. At all material times, Plaintiff has been qualified to perform her job and had no record of discipline or other performance matters.

11. Plaintiff has at all material times herein been the only African American female in her department.

12. Since on or about October 2023 Plaintiff has been diagnosed with Attention Deficit Disorder (ADD), anxiety and major depressive disorder. These mental health diagnoses affect Plaintiff's activities of daily living and are characterized as disabilities.

13. Defendant was informed of Plaintiff's mental health diagnosis on or about ?October when she first learned of the diagnosis.

14. On or about December 2023 Plaintiff complained through her union representative regarding the harassing treatment. Nepthy Cruz then emailed HR about the matter. Defendant did not respond to the complaint.

15. Again around February 2024 Plaintiff complained to Tracy of the harassing treatment that she was experiencing and the psychological damage that it was causing to her. Defendant did not respond to the plaintiff.

16. At a March 2024 meeting with Selina, Plaintiff was allowed the flexibility that until her ADA accommodation was approved, she and Lorraine would be kept from being in the office on the same days. This accommodation was granted after Plaintiff pushed for some remedy to the harassment and discrimination that she believed she was experiencing because of her disabilities.

17. Tracy admitted in the presence of Plaintiff and union representative Nepthy Cruz that she "had dropped the ball" on Plaintiff's complaint of discrimination. Selina also apologized and admitted that she too had dropped the ball by not properly training Dana to supervise properly.

18.    On or about April 2024 HR claimed that Plaintiff's claims of discrimination and harassment had resulted in interviews of Lorraine and Janae.   However, the interviews ended there. Defendant failed to proper investigation or interview other crucial witnesses such as Nico and Ms. Sugrue who witnessed the slander of Plaintiff in the open office for all to hear.

19.    Plaintiff has a learning disability that is part of the ADD.  The constant hostility and harassment exacerbated her anxiety and depression disorders.

20.    Plaintiff requested an accommodation for her mental health diagnoses by seeking to have a quiet work space within the department within which to work.

21.    On or about May 23, 2024   when Plaintiff reported to Lorraine that her computer was malfunctioning, she reached out to Plaintiff and stated that the computer was not powering on. When Plaintiff stated that it was anew computer, she never received the computer back.  Despite reporting this situation to Selina O'Toole,   she provided no assistance.   Plaintiff later learned from IT that it was prohibited for someone's tech issues with equipment to be reported by a ticket from someone else because of security concerns with the vital information included.  On or about March 2024 the Shari had an IT issue with her computer, she put in a ticket with IT and received proactive assistance from Selina with the computer issue that she was facing.  This was in contrast to the compete lack of assistance received for the Plaintiff by Selina.

22.    On or about July 4, 2024 she was supposed to be assigned to Maxcy Hall in the office/ classroom on the third floor as her requested accommodation to allow a quiet work space.

23.    On July 11, 2024 Plaintiff learned that what she believed to be a reasonable accommodation was only temporary.  She was informed of this by Selina O'Toole at the Thursdays meeting.

24.     On or about June or July 2024 a meeting was held on "Non-Apparent" , understanding non- Apparent Disabilities such as Mental Depression, Anxiety, PTSD.  That had been requested by Plaintiff to educate her peers on these issues in the hope that if they understood it better the hostile environment would change.

25.     On or about August 8, 2024 at a weekly team meeting Shari publicized to the group errors that she clime had been made by Plaintiff even after having received training on non-apparent disabilities.

26.     On or about August 14, 2024 Plaintiff contacted Selina O'Toole to determine if she needed to remove her belongings from the Maxcy Hall work area that she had been assigned as an accommodation.  O'Toole stated that she would look into the matter.  However, Plaintiff never heard back from O'Toole.

27.     On or about August 15, 2024 Plaintiff was denied the ability to begin work early.  However, at the same time other White co-workers of Plaintiff were permitted to begin work early as they desired.  As an example Sandra Sugrue would work early to leave early to support her ailing spouse.

28.     On or about August 29, 024 Plaintiff was due back on campus  but was left without any accommodation.  When she arrived at the site that had been supposed to be her accommodation, she discovered that he computer was missing and a note had been placed on her chair instructing her to not lock the door.

29.     Defendant thus revoked the accommodation that had been granted to Plaintiff and throughout the remainder of the summer no accommodation was allowed.

30.     On September 3, 2024 Plaintiff filed a complaint of discrimination with the Commission on Human Rights & Opportunities, alleging race discrimination, disability discrimination and retaliation.

31.     On or about September 9, 2024 Plaintiff contacted her immediate supervisor Dana Fauna to discuss her requested accommodation for a quiet work space.   Faugno informed Plaintiff that Faugno was going to have to speak with O'Toole.  However, neither Faugno or O'Toole ever got back to Plaintiff.

32.     On September 10, 2024 Plaintiff was placed on a medical leave due to persistent depression from on-going persistent harassment and lack of empathy from Defendant to protect her.

33.     Plaintiff was assigned to work in the admissions office of UNH.

Asked dana if she could take care o the file they had on me, never said yea or nay,

34.     On or about 2021 when Plaintiff began working in teams she later learned that the behavior of her co-workers was intentional on Sept 6 2023.   Plaintiff learned that certain of her co-workers, namely Lorraine Gatto and Shari Iannucci began placing any errors in the Teams platform that she made in an open workplace form.  They would then hold on to these notes of errors until face to face meetings or they would copy supervisors on error emails.

35.     Plaintiff noticed a pattern that emerged whereby Iannucci would wait to  inform Selina of any mistakes that had been made by Plaintiff instead of simply informing Plaintiff even though she was sitting right there.  Plaintiff on one occasion was sitting across from Ms. Iannucci engaging in a conversation when she then said " I am waiting for Selina because I am tired of fixing other people mistakes." Plaintiff asked her what mistake? Is it one of mine? She said, "yes," Plaintiff then  said "give me the name so that I could go in and take a look at it. "  Iannucci stat-

ed, " no! I am tired of fixing your mistakes!" Plaintiff told her if she would give it to her or let her know she could do it herself." Inannucci then gave Plaintiff the name of the student. Plaintiff's co-workers would purposefully look for any mistakes of hers as opposed to letting her know so that they could hold on to it until the next meeting even if it was a week away. Lorraine and Shari were comparators of Plaintiff because they held similar positions under the same supervisor (Dana Faugno). They made similar or even worse mistakes than the ones that Plaintiff was alleged to have made but were simply just told to fix those mistakes.

36. Iannucci and Selina would not give Plaintiff an opportunity to correct the errors. Lorraine and Shari began doing portions of Plaintiff's job. For examples regards transfer credits they claimed that they found errors in Plaintiff's work. On at least one occasion a transcript was claimed to be missing and Plaintiff later found out that Lorraine had the actual document. The supervisor was made aware of these antics by Lorraine and Shari against Plaintiff but did nothing to end the attempted sabotage of Plaintiff's work.

37. Because of the on-going actions to seemingly shame Plaintiff by bringing errors to her attention publicly, caused Plaintiff's already existent anxiety to be exacerbated.

38. Plaintiff complained to Dana Faugno on numerous occasions. about this conduct of Iannucci and Selina and asked that she intervene to stop the attempt to shame and humiliate.

39. Dana stated to Plaintiff that she would fix the problem. Her attempted "fix" was in the nature of stating during meetings "let's be nice to one another" or "let's be careful of how we talk to one another because we don't know what the other person is going through".

40. Despite these statements by Dana, the conduct by Iannucci and Selina continued.

41.     Plaintiff learned through that Lorraine frequently gossiped about and disparaged her to other of Plaintiff's co-workers.

42.     One of Plaintiff's co-workers who was a new hire, Jonah Cain, reported the gossip and disparagement of Plaintiff to Dana.  Cain informed Dana that Lorraine was repeatedly making insulting and slanderous claims against Plaintiff to the point that Cain felt uncomfortable.  Cain also informed Dana that Lorraine kept a file of Plaintiff's dates and times stamps of her comings and goings including bathroom breaks, lunch break, and work errors.

43.     Cain was trained by Lorraine to discriminate against Plaintiff.  For example, Lorraine instructed Cain that is she saw co-workers making errors equivalent to Plaintiff, she was to correct the error.  However, she was instructed that when Plaintiff made errors, she was to take a snippet of the error and to save it in the Teams platform.  Cain noted that despite there being errors from many of her co-workers, only Plaintiff was targeted by Lorraine.

44.     The plaintiff reported to Cain that Ms. Gatto was talking about her in a derogatory way harassing and discriminatory treatment. Cain reported it to Dana the same day that she was being talked about in a open forum , Dana reached out to the plaintiff to investigate and get her statement right away what Ms. Gatto stated about Ms. Cain.  However, Dana did no follow-ups when Ms. Cain reported second hand harassment towards the plaintiff at the time of her 90-day review no investigation further or follow-up.  Cain reported concerns about the  harassment she had observed regarding Plaintiff's situation to Faugno during her 90-day review. However, Faugno did not follow up on the report, nor did she investigate or interview any individuals named in the allegations.

45. Lorraine's repeated attacks permanently damaged Plaintiff's reputation to the point that staff would not even respond to Plaintiff's emails, other staff began performing her work, excluded her from seeing changes made to her work, and updates regarding her position.

46. Lorraine Gatto and Shari Iannucci have systematically collected records or examples of mistakes made by Plaintiff and saved them for use in team meetings to humiliate, and berate her in the presence of other staff. In addition to publicly airing Plaintiff's mistakes in teams meetings, they would also at times copy other staff on emails that were sent to her in order that those staff would also be informed regarding mistakes. Plaintiff's co-workers would create mistakes. For example, regarding missing transcript that Plaintiff would not have access to, opening transcripts in National Clearing House so that once it was open Plaintiff could not see it. Holding on to a transcript to make it appear that Plaintiff had not entered it in. There were also minor mistakes such as not checking off something from the checklist although it would not complete a file, not entering in a GPA score when working with a First Year, not clicking official or common. These type mistakes were made by all.

47. These actions exacerbated Plaintiff's mental health causing anxiety attacks every Tuesday night in apprehension that she would have to work in the office with Gatto and Iannucci on Wednesdays. Knowing that Plaintiff could not say anything to them about what they were doing to her caused more depressions and adverse impact on her work performance.

48. Plaintiff reached out to her union representative and a meeting was scheduled for November 19, 2023 with Human Resources wherein Plaintiff had complained in writing of a hostile work environment.

49. Defendant engaged in disparate treatment of Plaintiff as compared to other employees in the granting of terms and conditions of employment or work accommodations. For example when on or about March 2024 a white female employee Sandy Sugrue was permitted to work from the hospital of a close family member.

50. By contrast, on or about March 13, 2025 Plaintiff requested to be allowed to work temporarily from the hospital where her son was hospitalized for an extended period of time. Defendant would not grant Plaintiff this condition of work while having granted it to Sugrue.

51. On or about October 18, 2024 Tracy Crowley from HR and Selina O'Toole called Plaintiff at home and informed her that she would not be able to retune to work because Plaintiff's doctor was worried about her health. She stated that "I have already provided you with a quiet workplace (which had been revoked on August 29, 2024) and she had not seen any evidence that Plaintiff needed to miss meetings in order to perform the essential functions of the job." Crowley did not mention the fact that they had failed to protect Plaintiff from her prolonged harassment and belittlement during the weekly team meetings that was the cause of triggering Plaintiff's anxiety and depression. When Plaintiff attempted to question what would be the hardship to Defendant if she missed team meetings for a few weeks, Crowley simply stated that "she was not going to argue with Plaintiff about this."

52. On or about October 21, 2024 Plaintiff applied for temporary accommodation under the ADA to comply with her doctor's orders to refrain from attending meetings. It was Plaintiff's doctor's intent to work together with her to gradually return to meetings, thereby addressing her triggers and depression.

53.     On or about October 24, 2024 the Defendant rejected Plaintiff's ADA request to miss a few meetings during a sixty day period.  At the time of this request, team meetings were held only once weekly for approximately 1/2 hour so that the total time would have amount to about 8 hours over a sixty day period.

54.     White co-workers of Plaintiff were permitted to enjoy this privilege without opposition or even need for paperwork. Plaintiff was required  to file FMLA  paperwork just to be able to be exempt from sitting out on meetings totaling 8 hours while Sandra Sugrue, secretary for International admissions, whose husband was hospitalized with cancer was allowed for some 3-4 months to work from her husband's hospital room. She ran out of all personal time including FMLA leave, however,  O'Toole on one occasion allowed Sugrue to be signed off for an entire week.  Sugrue was allowed to achieve this  by simply sending an email.

55.     On one occasion O'Toole said in the presence of Plaintiff and Shari that "none of you will ever lose any money because of running out of time".

56.      Defendant denied Plaintiff's request but did not provide her with a formal Accommodation Denial Form.  It was Plaintiff's understanding that she was supposed to be provided with a Denial Form should she wish to contest the decision.

57.     On January 21, 2025 upon Plaintiff's return to work, she was placed in a high-traffic area next to a glass door, despite her documented need for a quiet workspace due to her disability. This was an area where students and faculty walked and talked constantly; co-workers intentionally left the door open, causing disruption and exacerbating Plaintiff's  anxiety. This area was the exact opposite of a quiet space and in fact on one occasion there was a question by the fire marshal for the university as to whether Plaintiff's desk placement created a fire hazard.

59.     On March 27, 2025 Plaintiff  submitted an EVF (electronic verification form) for intermittent leave to after an anxiety attack.   Tracy Crowley, HR, filled it out as continuous leave despite Plaintiff's request for intermittent leave, causing her initial leave request to be denied.  The delay and misclassification of the requested prevented Plaintiff   from receiving timely leave payments and created financial hardship.

60.     On April 1 & 3, 2025  Plaintiff caught a payroll mistake that she had made in her own time record.   She reported it to her supervisor before submitting her time card.   However, the supervisor  Faugno told her to submit as-is, allowing financial discrepancies to continue.   In fact Faugno signed off on the incorrect time record even after Plaintiff informed her of the error.

61.     On May 22, 2025  Plaintiff experienced a severe anxiety attack at work.   Iris Calovine (HR) and Dana Faguano (supervisor) were present but took no action.   Plaintiff had visible shaking of her hands, arms and legs, she began hyperventilating.  Even when she was given a cup of water, she was shaking so badly that the water was spilling out of the cup.  No one would assist Plaintiff in the moment when it was needed.    Faugno went to HR and asked  them to please call Plaintiff's husband who then called an ambulance and then came and retrieved her.

62.     Immediate medical attention was denied, and accommodations were refused to Plaintiff.

63.     On May 14, 2025, due to the physical strain of carrying her work laptop, Plaintiff briefly used Cain's computer. O'Toole's response was that this was not Plaintiff's designated workstation.   Plaintiff's use of Cain's computer did not interfere with any work, especially since there were three other available computers and no other employees present at the time.

64.    Plaintiff had in the past witnessed Cain using Shari's computer on January 30th without any similar objection.

65.    Around February or March of 2025, students were using computers for registration. The denial of access to readily available computers, despite the physical demands of carrying a laptop and the clear availability of resources, caused Plaintiff to question O'Toole why she was the only person carrying their laptop.  O'Toole stated "it's not her business what they do with their laptop."

66.    On May 27 - June 9, 2025 Plaintiff applied for intermittent leave under the Connecticut Paid Leave statute.  However, Defendant  HR refused to approve the intermittent leave and delayed processing, not  approving it until July 18, six weeks after application, creating financial strain.

67.    HR and supervisors repeatedly ignored Plaintiff's medical restrictions, mishandled benefits and failed to protect her from a hostile work environment based on her actual and perceived disabilities

68.    On June 6-7, 2025 Selina O'Toole informed Plaintiff that she could not sit out of team meetings because she "need to socialize with co-workers. "This ignored Plaintiff's  documented medical restrictions and was a denial of a reasonable accommodation.

69.    On July 1, 2025 Plaintiff was denied personal leave and other benefits, despite her renewed FMLA entitlement, further preventing her from receiving payments and creating ongoing financial discrimination and attempts to force her termination.

70.    On July 2, 2025  Plaintiff' application for FMLA Approval Leave of Absence  was finally approved for  intermittent leave retroactively.

71.    On July 10, 2025  Plaintiff's. Grievance regarding denial of return-to-work accommodation was denied although she was not terminated or disciplined.  On the next day, Plaintiff  received a termination letter, immediately following her protected activity.

72.    This termination came  9 days after Plaintiff's benefits renewal and immediately after grievance denial.  Defendant did not provide accrued benefits to Plaintiff.

COUNT ONE:    TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED
               (RACE DISCRIMINATION)

1-72.    Paragraphs 1-72 are incorporated by reference and made paragraphs 1-72 of this Count One.

73.    The acts of Defendant and its agents and employees engaged in conduct that discriminated against Plaintiff based upon her race.

74.    Plaintiff has been damaged thereby.

COUNT TWO:    TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED
               (RETALIATION)

1-72.    Paragraphs 1-72 are incorporated by reference and made paragraphs 1-72 of this Count Two.

73.    The acts of Defendant and its agents and employees was intended to retaliate against Plaintiff because of her opposition to conduct that she reasonably believed tone discriminatory, including by making internal and external complaints of discrimination.

74.    Plaintiff has been damaged thereby.

COUNT THREE:    AMERICANS WITH DISABILITIES ACT

1-72.   Paragraphs 1-72 are incorporated by reference and made paragraphs 1-72 of this Count Three.

73.    Defendant failed and refused to provide a reasonable accommodation for Plaintiff's known disabilities in violation of the Americans with Disabilities Act.

74.    Plaintiff has been damaged thereby.

COUNT FOUR:    CONNECTICUT FAIR EMPLOYMENT PRACTICES ACT (RACE DISCRIMINATION)

1-72.   Paragraphs 1-72 are incorporated by reference and made paragraphs 1-72 of this Count Four.

73.    The conduct of Defendant and its agents and employees discriminated against Plaintiff based upon her race in violation of the Connecticut Fair Employment Practices Act.

74.    Plaintiff has been damaged thereby.


COUNT FIVE:    CONNECTICUT FAIR EMPLOYMENT PRACTICES ACT (RETALIATION)

1-72.   Paragraphs 1-72 are incorporated by reference and made paragraphs 1-72 of this Count Five.

73.    The conduct of Defendant and its agents and employees was intended to retaliate against Plaintiff because of engaging in opposition to Defendant, including button limited to internal and external complaints.

74.    Plaintiff has been damaged thereby.

COUNT SIX:          CONNECTICUT FAIR EMPLOYMENT PRACTICES ACT
                    (DISABILITY DISCRIMINATION)

1-72.   Paragraphs 1-72 are incorporated by reference and made paragraphs 1-72 of this Count

Six.

73.     Defendant failed and refused to provide a reasonable accommodation for Plaintiff's

known disabilities in violation of the Connecticut Fair Employment practices.

74.     Plaintiff has been damaged thereby.

COUNT SIX:          CONNECTICUT FAIR EMPLOYMENT PRACTICES ACT
                    (HOSTILE WORK ENVIRONMENT)

1-72.   Paragraphs 1-72 are incorporated by reference and made paragraphs 1-72 of this Count

Six.

73.     Defendant permitted Plaintiff to be subjected to a hostile work environment based upon

race and/or disability.

74.     Plaintiff has been damaged thereby.

COUNT SEVEN:        CIVIL RIGHTS ACT OF 1964, AS AMENDED (HOSTILE WORK
                    ENVIRONMENT)

1-72.   Paragraphs 1-72 are incorporated by reference and made paragraphs 1-72 of this Count

Seven.

73.     Defendant permitted Plaintiff to be subjected to a hostile work environment based upon

race and/or disability.

74.     Plaintiff has been damaged thereby.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A.      Enter judgment in favor of Plaintiff and against Defendant on all counts;

B.      Award Back pay, front pay, and all other equitable relief;

C.      Award compensatory damages for emotional distress and other non-economic

losses;

D.      Award reasonable attorneys fees and costs pursuant to 42 U.S.C. Section 1988.

E.      Grant such other and further relief as this Court deems just and proper.

FOR THE PLAINTIFF
BY: */s/Josephine Smalls Miller*
Josephine Smalls Miller, Fed Bar # ct23709
130 Deer Hill Avenue, Unit 13
Danbury, CT. 06810
Tel:  (203) 512-2795
Email: jsmillerlaw@gmail.com

CERTIFICATION

This is to certify that the foregoing Complaint was filed on May 3, 2026.  All parties may access this filing through the court CMECF system.


*/s/Josephine Smalls Miller*
Josephine Smalls Miller